1

2

3

4                          UNITED STATES DISTRICT COURT

5                         NORTHERN DISTRICT OF CALIFORNIA

6

7    HOMEAWAY INC., et al.,                    Case No. 14-cv-04859-JCS

              Plaintiffs,
8
                                               ORDER GRANTING MOTION TO
9         v.                                   DISMISS AND DENYING MOTION
                                               FOR PRELIMINARY INJUNCTION
10   CITY AND COUNTY OF SAN
     FRANCISCO, et al.,                        Re: Dkt. Nos. 15, 27
11
              Defendants.

12   **I.      INTRODUCTION**

13          This case concerns Ordinance No. 218-14 (the "Ordinance") enacted by Defendant City

14   and County of San Francisco ("San Francisco" or the "City"),[1] which regulates short-term rentals

15   of residential housing.  Plaintiffs HomeAway, Inc. and HomeAway.com, Inc. (collectively,

16   "HomeAway") bring this action seeking: (1) a declaration that the Ordinance violates the negative

17   implications of the Commerce Clause of the United States Constitution by impermissibly

18   discriminating against non-local interests and unreasonably interfering with interstate commerce;

19   and (2) an injunction barring its enforcement.  The City now moves to dismiss HomeAway's

20   claim, and HomeAway moves for a preliminary injunction.  The Court held a hearing on January

21   23, 2015.  For the reasons stated below, the City's motion to dismiss is GRANTED, and

22   HomeAway's motion for a preliminary injunction is DENIED.[2]

23

24

25

26   _____
     [1] San Francisco Director of City Planning John Rahaim is also named as a defendant in his official
27   capacity.  There are no claims specific to Rahaim that do not also apply to San Francisco.  This
     Order refers to both Defendants collectively as the "City."
28   [2] The parties have consented to the jurisdiction of the undersigned magistrate judge for all
     purposes pursuant to 28 U.S.C. § 636(c).

United States District Court
Northern District of California

## II.      BACKGROUND

### A.      The Ordinance

Before the Ordinance, the City's municipal code had long prohibited the rental of residential housing units for less than thirty days.  *See* Compl. (dkt. 1) ¶¶ 31−33; Decl. of Jeremy M. Goldman in Support of Mot. to Dismiss ("Goldman MTD Decl.," dkt. 17) Ex. A (Ordinance as passed by the City's Board of Supervisors, hereinafter cited as "Ordinance") at 2.  According to the Board of Supervisors, the prohibition was intended to limit "the loss of housing for permanent residents" caused by "widespread conversion of residential housing to short-term rentals, commonly referred to as hotelization."  Ordinance at 2.  HomeAway alleges that the City did not enforce that prohibition, but instead tacitly permitted such rentals and collected taxes from property owners and residents who rented their properties (or portions thereof) to short-term visitors.  Compl. ¶ 33.

The City passed the Ordinance in October of 2014.  *Id.* ¶¶ 40, 46; *see generally* Ordinance. The Ordinance allows short-term rentals under certain circumstances.  Compl. ¶ 47.  Most significantly, it only permits such rentals for units where a "Permanent Resident occupies the Residential Unit for no less than 275 days out of the calendar year in which the Residential Unit is rented as a Short-Term Residential Rental."  Ordinance at 17 (enacting S.F. Admin. Code § 41A.5(g)(1)(A));[3] *see* Compl. ¶ 48.  "[I]f the Permanent Resident has not rented or owned the Residential Unit for the full preceding calendar year," short-term rentals are permitted if the permanent resident has occupied the unit "for no less than 75% of the days he or she has owned or rented the Residential Unit."  Ordinance at 17 (enacting S.F. Admin. Code § 41A.5(g)(1)(A)).  A "Permanent Resident" is defined as a "person who occupies a Residential Unit for at least 60 consecutive days with intent to establish that unit as his or her primary residence," and "may be an owner or a lessee."  *Id.* at 12 (amending S.F. Admin. Code § 41A.4).

The Ordinance also includes requirements for "Hosting Platforms," defined as follows:

---

[3] The text of the Ordinance uses strikethroughs, underlines, and italics to indicate insertions and deletions to preexisting provisions of San Francisco's Planning Code and Administrative Code. This Order omits those indicators and quotes only the final language of the municipal codes as amended by the Ordinance.

1

> A person or entity that provides a means through which an Owner
> may offer a Residential Unit for Tourist or Transient Use. This
> service is usually, though not necessarily, provided through an
> online platform and allows an Owner to advertise the Residential
> Unit through a website provided by the Hosting Platform and
> provides a means for potential tourist or transient users to arrange
> Tourist or Transient Use and payment, whether the tourist or
> transient pays rent directly to the Owner or to the Hosting Platform.

*Id.* at 11 (amending S.F. Admin. Code § 41A.4). HomeAway challenges a single provision

applicable to Hosting Platforms, requiring them to "comply with the requirements of the [San

Francisco] Business and Tax Regulations Code by, among other applicable requirements,

collecting and remitting all Transient Occupancy Taxes." *Id.* at 22 (enacting S.F. Admin. Code

§ 41A.5(g)(4)(B)).

By its terms, the Ordinance becomes effective on February 1, 2015. Compl. ¶ 46;

Ordinance at 31.

**B.    HomeAway**

HomeAway alleges that it "operates the world's largest online marketplace in the vacation

rental industry, comprising a number of websites," including four "directed principally to Listing

Owners and Travelers in the United States[:] HomeAway.com, VRBO.com, VacationRentals.com,

and BedandBreakfast.com." Compl. ¶¶ 22−23. HomeAway's websites include listings for "over

one million individually-controlled and managed vacation rental properties located in all 50 of the

United States and 190 countries around the world." *Id.* ¶ 24. HomeAway does not charge fees to

potential lessees,[4] and instead "derives its primary revenue from Listing Owners who advertise on

its website." *Id.* ¶¶ 27, 29. The "Listing Owners" (i.e., lessors seeking to advertise their

properties) pay for HomeAway's services through one of two mechanisms: either by purchasing  a

subscription to place a listing for a certain period of time, or through a "pay-per-booking" product

in which the lessor "agrees to pay up to 10% of the value of a confirmed booking for the listing."

*Id.* ¶ 29. Subscriptions are HomeAway's primary source of revenue; pay-per-booking is "far less

common." *Id.*

Whichever method of payment is employed for a listing, HomeAway alleges that it does

---

[4] Lessees may pay purchase ancillary products such as "guarantees, deposit insurance, and travel
insurance through HomeAway." Compl. ¶ 28.

United States District Court
Northern District of California

not participate directly in rental transactions:

> HomeAway does not make agreements with Travelers to rent properties from Listing Owners or collect rental fees from Travelers for remittance to Listing Owners.  HomeAway is not a party to the rental transaction.  And HomeAway does not receive any rental fees from Travelers.

*Id.* ¶ 30.  Lessees instead "transact directly with Listing Owners to arrange their stay" after finding a suitable property through one of HomeAway's websites.  *See id.* ¶ 27.

> In short, HomeAway is not an agent of the Listing Owner.  Rather, HomeAway supports the relationship between the Listing Owner who provides the service (*i.e.*, the accommodation) and the user of the service (*i.e.*, the Traveler), which has been standard practice in the vacation rental industry for over 70 years.  Travelers arrange their stay directly with Listing Owners and HomeAway charges the Listing Owner only for the advertising services it provides . . . . Listing Owners maintain their own books and customer lists and are otherwise responsible for the rental of their properties.

*Id.* ¶ 59.  HomeAway alleges that, due to its business model, it "does not conduct its operations in a manner that enables it to collect and hold rent from Travelers, calculate and collect Transient Occupancy Taxes from Travelers, nor definitively know whether a transaction has occurred between the Traveler and Listing Owner that would give rise to Transient Occupancy Taxes.  *Id.*

## C.    HomeAway's Claims and the Present Motions

HomeAway challenges two provisions of the Ordinance, both under the dormant Commerce Clause.  The City moves to dismiss the Complaint in its entirety, and HomeAway moves for a preliminary injunction barring enforcement of the provisions challenged under each claim.

First, HomeAway challenges the Ordinance's occupancy requirement, arguing that it impermissibly discriminates against interstate commerce by allowing only San Francisco permanent residents to rent out their property on a short-term basis.  Compl. ¶¶ 67-72.  Based on the assertion that the residency requirement discriminates against out-of-state owners of property in San Francisco, HomeAway argues that the City must show that it is "necessary to achieve an important local purpose," and has failed to do so.  *Id.* ¶ 68.

The City argues that, as a threshold issue, HomeAway lacks prudential standing to challenge the occupancy requirement, and that its attempt to do so is an improper assertion of the

4

rights of non-resident property owners who more directly face alleged discrimination.  Mot. to Dismiss ("MTD" dkt. 15) at 12−14.  The City also disputes HomeAway's arguments as to the merits, claiming that the occupancy requirement is not discriminatory because it is based on an owner's *use* of his or her property rather than on his or her state of residence, *id.* at 14−15, and that the city's legitimate interest in preserving its long-term housing stock is sufficient to justify any impact on commerce, *id.* at 16−19.

Second, HomeAway argues that the tax collection requirement discriminates against interstate commerce because it favors the "agency" business model that HomeAway's San Francisco-based competitor Airbnb uses, as compared to HomeAway's "advertising venue" model.  Compl. ¶¶ 57−66.  HomeAway alleges that Airbnb lobbied in favor of the Ordinance and made substantial campaign contributions to the Ordinance's sponsor on the City's Board of Supervisors.  *See id.* ¶¶ 36−46.  According to HomeAway, Airbnb's lobbying activity is evidence of the City's intent to favor a local business at the expense of out-of-state competitors.  *See id.* ¶ 64; MTD Opp'n (dkt. 23) at 19.

The City argues that the Ordinance imposes no new tax collection requirements on hosting platforms, and instead only reaffirms existing obligations under the San Francisco Business and Tax Regulations Code.  MTD at 6−7.  According to the City, because the tax collection provision imposes no new obligation, HomeAway lacks constitutional standing to challenge it.  *Id.* at 8.  The City also argues that HomeAway's claim fails because the tax collection provision does not facially differentiate between in-state and out-of-state hosting platforms, and regulation that favors one business model over another does not implicate the Commerce Clause.  *See id.* at 8−12.

With respect to both challenged provisions, HomeAway also argues that even they are not discriminatory, they nevertheless violate the dormant Commerce Clause because they "impose a substantial burden on interstate commerce in excess of their putative benefits to the City."  Compl. ¶ 74.

## III.   LEGAL STANDARDS

### A.   Motion to Dismiss

A complaint may be dismissed for failure to state a claim on which relief can be granted

1   under Rule 12(b)(6) of the Federal Rules of Civil Procedure.  Fed. R. Civ. P. 12(b)(6).  "The

2   purpose of a motion to dismiss under Rule 12(b)(6) is to test the legal sufficiency of the

3   complaint."  *N. Star Int'l v. Ariz. Corp. Comm'n*, 720 F.2d 578, 581 (9th Cir. 1983).  Generally, a

4   plaintiff's burden at the pleading stage is relatively light.  Rule 8(a) of the Federal Rules of Civil

5   Procedure states that "[a] pleading which sets forth a claim for relief . . . shall contain . . . a short

6   and plain statement of the claim showing that the pleader is entitled to relief."  Fed. R. Civ. P.

7   8(a).

8       In ruling on a motion to dismiss under Rule 12(b)(6), the court analyzes the complaint and

9   takes "all allegations of material fact as true and construe[s] them in the light most favorable to the

10  non-moving party."  *Parks Sch. of Bus. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995).

11  Dismissal may be based on a lack of a cognizable legal theory or on the absence of facts that

12  would support a valid theory.  *Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir.

13  1990).  A complaint must "contain either direct or inferential allegations respecting all the material

14  elements necessary to sustain recovery under some viable legal theory."  *Bell Atl. Corp. v.

15  Twombly*, 550 U.S. 544, 562 (2007) (citing *Car Carriers, Inc. v. Ford Motor Co.*, 745 F.2d 1101,

16  1106 (7th Cir. 1984)).  "A pleading that offers 'labels and conclusions' or 'a formulaic recitation

17  of the elements of a cause of action will not do.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009)

18  (quoting *Twombly*, 550 U.S. at 555).  "Nor does a complaint suffice if it tenders 'naked

19  assertion[s]' devoid of 'further factual enhancement.'"  *Id.* (quoting *Twombly*, 550 U.S. at 557).

20  Rather, the claim must be "'plausible on its face,'" meaning that the plaintiff must plead sufficient

21  factual allegations to "allow[] the court to draw the reasonable inference that the defendant is

22  liable for the misconduct alleged."  *Id.*  (quoting *Twombly*, 550 U.S. at 570).

23      Although a court generally may not consider materials beyond the pleadings under Rule

24  12(b)(6), a court may take judicial notice of matters of public record, *Lee v. City of Los Angeles*,

25  250 F.3d 668, 689 (9th Cir. 2001), and may consider documents "whose contents are alleged in a

26  complaint and whose authenticity no party questions, but which are not physically attached to the

27  plaintiff's pleading," *Knievel v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (brackets and citation

28

United States District Court
Northern District of California

6

omitted).[5]

The City's challenge to HomeAway's Article III standing questions the Court's subject-matter jurisdiction under Rule 12(b)(1), and the City acknowledges that Courts have considered prudential standing under both Rule 12(b)(1) and Rule 12(b)(6).  *See* MTD 12−13 n.7.  Where, as here, a jurisdictional challenge is based on the allegations of a plaintiff's complaint rather than on extrinsic evidence, courts "assume [the plaintiff's] allegations to be true and draw all reasonable inferences in his favor."  *Wolfe v. Strankman*, 392 F.3d 358, 362 (9th Cir. 2004).  Under these circumstances, "the inquiry is therefore much like a Rule 12(b)(6) analysis."  *See Animal Legal Defense Fund v. HVFG LLC*, 939 F. Supp. 2d 992, 997 (N.D. Cal. 2013).

**B.    Dormant Commerce Clause**

The United States Constitution grants Congress the "Power to . . . regulate Commerce . . . among the several States."  U.S. Const. art. I § 8.  From that grant of authority, the courts have inferred "'a further, negative command, known as the dormant Commerce Clause,'" which "prevents a State from 'jeopardizing the welfare of the Nation as a whole' by 'plac[ing] burdens on the flow of commerce across its borders that commerce wholly within those borders would not bear.'"  *Am. Trucking Ass'ns Inc. v. Mich. Pub. Serv. Comm'n*, 545 U.S. 429, 433 (2005) (quoting *Okla. Tax Comm'n v. Jefferson Lines, Inc.*, 541 U.S. 175, 179−80 (1995)) (alteration in original).  The dormant Commerce Clause restricts local governments as well as states.  *See C & A Carbone, Inc. v. Town of Clarkstown*, 511 U.S. 383, 391 (1994).  The appropriate level of scrutiny for a dormant Commerce Clause claim depends on whether the law at issue discriminates against interstate, as opposed to intra-state, commerce.

"In this context, 'discrimination' simply means differential treatment of in-state and out-of-state economic interests that benefits the former and burdens the latter."  *United Haulers Ass'n, Inc. v. Oneida-Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 338 (2007) (citations and internal quotation marks omitted).  "Conceptually, of course, any notion of discrimination assumes a comparison of substantially similar entities."  *Gen. Motors Corp. v. Tracy*, 519 U.S. 278, 298

---

[5] The Court takes judicial notice of the Ordinance based on both of these doctrines.

United States District Court
Northern District of California

1    (1997) (footnote omitted).  "The central rationale for the rule against discrimination is to prohibit

2    state or municipal laws whose object is local economic protectionism, laws that would excite those

3    jealousies and retaliatory measures the Constitution was designed to prevent."  *C & A Carbone*,

4    511 U.S. at 390. "Municipal or county laws that favor local interests at the expense of others are

5    no less suspect for lumping some more distant in-state interests together with out-of-state interests

6    as subject to discrimination."  *Id.* at 391 (citing *Dean Milk Co. v. Madison*, 340 U.S. 349 (1951)).

7         "Discriminatory laws motivated by 'simple economic protectionism' are subject to a

8    'virtually *per se* rule of invalidity,' which can only be overcome by a showing that the State has no

9    other means to advance a legitimate local purpose." *Tracy*, 519 U.S. at 338−39 (citations

10   omitted).  Although demanding, this standard is not insurmountable—the Supreme Court has held

11   that the dormant Commerce Clause "does not elevate free trade above all other values," and that

12   "[a]s long as a State does not needlessly obstruct interstate trade or attempt to place itself in a

13   position of economic isolation, it retains broad regulatory authority to protect the health and safety

14   of its citizens and the integrity of its natural resources." *Maine v. Taylor*, 477 U.S. 131, 151−52

15   (1986) (upholding a Maine law prohibiting importation of live baitfish from out of state).

16        Where a state or local law regulating commerce is not discriminatory, it may still violate

17   the dormant Commerce Clause if "the burden imposed on [interstate] commerce is clearly

18   excessive in relation to the putative local benefits." *Tracy*, 519 U.S. at 298 n.12 (quoting *Pike v.*

19   *Bruce Church, Inc.,* 397 U.S. 137, 142 (1970)) (alteration in original).  In *Tracy*, the Supreme

20   Court discussed the nature of this standard and its relation to the standard for discriminatory laws

21   as follows:

22            There is, however, no clear line between these two strands of
              analysis, and several cases that have purported to apply the undue
23            burden test (including *Pike* itself) arguably turned in whole or in part
              on the discriminatory character of the challenged state regulations
24            Nonetheless, a small number of our cases have invalidated state laws
              under the dormant Commerce Clause that appear to have been
25            genuinely nondiscriminatory, in the sense that they did not impose
              disparate treatment on similarly situated in-state and out-of-state
26            interests, where such laws undermined a compelling need for
              national uniformity in regulation.

27   *Id.* (citations, including explanatory parentheticals, omitted).

28
                                        8

United States District Court
Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## IV.    ANALYSIS OF OCCUPANCY REQUIREMENT CHALLENGE

HomeAway first challenges the Ordinance's occupancy requirement—that a property owner or long-term lessee can only offer property for short-term rental if he or she resides in the unit for at least 275 days of the year—on the basis that it impermissibly discriminates against out-of-state property owners who necessarily cannot satisfy the requirement because, by definition, they do not reside in San Francisco.  The City disputes that the occupancy requirement violates the dormant Commerce Clause, but argues as a threshold issue that HomeAway lacks prudential standing to challenge that requirement.  For the reasons stated below, the Court agrees that HomeAway, which is not a party to the transactions that the occupancy requirement governs, is not the proper plaintiff to challenge it.

### A.    Prudential Standing and Third-Party Interests

The doctrine of prudential standing includes a number of rules "not derived from Article III" that limit which plaintiffs may bring a given claim.  *See Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377, 1386 (2014).  In this case, the City invokes "the rule that a party 'generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties.'"  *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004) (quoting *Warth v. Seldin*, 422 U.S. 490, 498 (1975)); *see also Powers v. Ohio*, 499 U.S. 400, 410 (1991).  "This rule assumes that the party with the right has the appropriate incentive to challenge (or not challenge) governmental action and to do so with the necessary zeal and appropriate presentation."  *Id.*

Courts have recognized an exception to this rule where a litigant can show both (1) that it has a close relationship with the third party whose rights the litigant seeks to assert; and (2) that the third party would be hindered in asserting its own interests.[6]  *Kowalski*, 543 U.S. at 130.  Although the rule is somewhat relaxed in certain contexts not applicable here—"[w]ithin the

---

[6] Some cases list a third requirement for prudential third-party standing, that the plaintiff itself has suffered (or will suffer) an injury, *e.g.*, *Powers*, 499 U.S. at 410−11, while others treat that as a separate question of whether the plaintiff has Article III standing, *e.g.*, *Kowalski*, 543 U.S. at 129. Here, the City does not challenge HomeAway's Article III standing with respect to the occupancy requirement, and the Court finds that HomeAway has sufficiently alleged that it faces a loss of revenue as a result of that requirement.

1  context of the First Amendment, for example," and "when enforcement of the challenged

2  restriction *against the litigant* would result indirectly in the violation of third parties' rights"—the

3  Supreme Court has generally "not looked favorably upon third-party standing." *Id.* (citations and

4  internal quotation marks omitted; emphasis in original).

5      **B.    Prudential Standing in This Context Survives *Lexmark***

6          As a starting point, the Court holds that the prudential standing doctrine implicated in this

7  case is alive and well.  HomeAway suggests otherwise in footnotes of its briefs in support of its

8  preliminary injunction motion, arguing that the Supreme Court "cast doubt on the validity of the

9  doctrine" in *Lexmark International, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377

10 (2014).  Prelim. Inj. Reply (dkt. 34) at 3 n.4; *see also* Prelim. Inj. Mot. (dkt. 27) at 12 n.1.  That

11 case, however, held that "a court . . . cannot limit a cause of action *that Congress has created*

12 merely because 'prudence' dictates." *Lexmark*, 134 S. Ct. at 1388 (emphasis added).  The

13 Supreme Court went on to apply two standing-like inquiries ("zone of interest" and proximate

14 causation) as questions of statutory interpretation rather than prudential standing, presuming that

15 Congress intends to limit statutory causes of action to "plaintiffs whose interests fall within the

16 zone of interests protected by the law invoked" and "whose injuries are proximately caused by

17 violations of the statute." *Id.* at 1388, 1390 (citations and internal quotation marks omitted).

18          *Lexmark* includes the expansive pronouncement that "'a federal court's obligation to hear

19 and decide' cases within its jurisdiction 'is virtually unflagging.'" *Id.* at 1386 (quoting *Sprint*

20 *Commc'ns, Inc. v. Jacobs*, 134 S. Ct. 584, 591 (2013)).  The word "virtually," of course,

21 acknowledges that some exceptions exist, and *Lexmark* in fact lists "the general prohibition on a

22 litigant's raising another person's legal rights" as one such exception employed in past cases.  *See*

23 *id.* (quoting *Elk Grove Unified Sch. Dist. v. Newdow*, 542 U.S. 1, 12 (2004)).  It is not clear in

24 context, however, whether that doctrine is cited with approval or disapproval.  *See id.*  In a

25 footnote, the Supreme Court noted that "limitations on third-party standing are harder to classify"

26 than other doctrines that are not truly prudential, that many Supreme Court cases have framed it as

27 a prudential standing doctrine, and that "consideration of that doctrine's proper place in the

28 standing firmament can await another day." *Id.* at 1387 n.3 (citing *Kowalski*, 543 U.S. at 128−29).

United States District Court
Northern District of California

10

United States District Court
Northern District of California

1    Given that ambiguity, the Court declines to extend *Lexmark* to invalidate a prudential

2  standing doctrine that it explicitly did not reach, in the context of a constitutional rather than

3  statutory claim.  To disregard prudential standing for *constitutional* claims—particularly where, as

4  here, the constitutional rule is implied by rather than explicit in the Constitution itself—would

5  open the courts to claims by parties only remotely or indirectly affected by a challenged action or

6  statute, because the statutory interpretation doctrines that the Supreme Court relied on in *Lexmark*

7  are not available as an alternative gatekeeper when there is no statute to interpret.  This sort of

8  claim also does not implicate *Lexmark*'s inter-branch comity consideration of giving full effect to

9  a "cause of action *that Congress has created*."  *Id.* at 1388 (emphasis added).   Further, extending

10  the principles of *Lexmark* to overturn established precedent like *Kowalski,* cited in *Lexmark* as an

11  issue to revisit another day, would disregard the Supreme Court's instruction that "lower courts

12  should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of

13  overruling its own decisions."  *Agostini v. Felton*, 521 U.S. 203, 207 (1997).

14    The Court's holding here is consistent with a number of other courts that have interpreted

15  *Lexmark* as leaving the prudential doctrine of third-party standing unaffected.  In *Moncier v.*

16  *Haslam*, the Sixth Circuit noted that *Lexmark* "abrogate[ed] a line of prudential-standing cases not

17  relevant to this appeal," and went on to recite, as still valid, the doctrine that a plaintiff must assert

18  his own legal rights.  570 Fed. App'x 553, 556 (6th Cir. 2014).  An order by the Southern District

19  of New York cited *Lexmark* as authority for the *validity* of that doctrine, but ultimately held that

20  the doctrine did not apply because the statute at issue explicitly authorized *parens patriae* suits.  *In*

21  *re Elec. Books Antitrust Litig.*, 14 F. Supp. 3d 525, 534−35 (S.D.N.Y. 2014); *see also Pringle v.*

22  *Atlas Van Lines*, 14 F. Supp. 3d 796, 799−800 (N.D. Tex. Apr. 16, 2014).  The District of Oregon

23  has stated that it will continue to apply older prudential third-party standing precedent based on

24  the *Lexmark* Court's decision to reserve the issue.  *Calista Enters. Ltd. v. Tenza Trading Ltd.*, No.

25  3:13-CV-01045-SI, 2014 WL 3695487, at *6 n.7 (D. Or. July 24, 2014).  HomeAway has not

26  cited, and the Court is not aware of, any decisions that have taken the opposite approach.

27

28

**C.    HomeAway Lacks Prudential Standing to Challenge Alleged Discrimination Against Non-Resident Lessors**

The City argues that HomeAway's challenge to the residency requirement is an improper attempt to assert the rights of non-resident property owners who directly face the purported discrimination. MTD at 12−14. HomeAway responds, primarily, that its claim is based on its own right to engage in unfettered interstate commerce, not on the rights of third parties. MTD Opp'n at 9–11. HomeAway also argues, in a short footnote, that it has standing to assert the rights of property owners who use its services. *Id.* at 11 n.3.

**1.    Purported Discrimination Against Out-of-State Property Owners Does Not Implicate a Cognizable Right of HomeAway Itself**

The first question before the Court is whether the Ordinance's occupancy requirement implicates HomeAway's own rights, such that HomeAway may challenge the requirement on its own behalf without need to rely on purported violations of the rights of HomeAway's customers. Although prudential standing under the dormant Commerce Clause is not limited to parties that are themselves discriminated against, the Court is aware of no authority extending such standing to private parties that are not either (1) direct parties to a regulated transaction, e.g., purchasers of out-of-state products subject to a discriminatory tax; or (2) themselves directly impacted by the law, e.g., required to pay a tax for owning stock in an out-of-state corporation. Because HomeAway alleges that it is not a party to the rental transactions that the Ordinance governs, the Court holds that HomeAway lacks prudential standing to challenge the occupancy requirement.

**a.    Prudential Standing Is Not Limited to Direct Targets of Discrimination**

Standing to bring a claim under the dormant Commerce Clause is not limited to "members of the class against whom a State ultimately discriminates." *Tracy*, 519 U.S. at 286. The Supreme Court has repeatedly considered dormant Commerce Clause claims brought by another party to a transaction restricted by a purportedly discriminatory law. In *Tracy*, the Court held that General Motors, as a purchaser of natural gas, had standing to challenge an Ohio law that (according to General Motors) discriminated against out-of-state gas producers. *See id.* at 286–87. In *Bacchus Imports, Ltd. v. Dias*, the Court held that Hawaiian liquor wholesalers had standing to challenge a tax that discriminated against liquor produced in other states. 468 U.S. 263, 267 (1984). As the

United States District Court
Northern District of California

Court noted in *Tracy*, it has also considered claims from similarly-situated parties in *Fulton Corp. v. Faulkner*, where an "in-state stockholder challenged [a] tax regime imposing higher taxes on stock from issuers with out-of-state operations than on stock from purely in-state issuers," and *West Lynn Creamery, Inc. v. Healy*, where "in-state milk dealers challenged [a] tax and subsidy scheme discriminating against out-of-state milk producers." *Tracy*, 519 U.S. at 287 (summarizing *Fulton Corp.*, 516 U.S. 325 (1996), and *West Lynn Creamery*, 512 U.S. 186 (1994)).

Each of these cases involved in-state plaintiffs who were not themselves discriminated against. In *Tracy*, *Bacchus Imports*, and *West Lynn Creamery*, the plaintiffs purchased products from out-of-state sellers and thus faced higher prices (or perhaps less selection) as a result of purportedly discriminatory taxes. In *Fulton Corp.*, the impact was more direct: North Carolina's law imposed a tax on stock "inversely proportional to the corporation's exposure to the State's income tax," and thus the in-state stockholder that brought the claim was itself required to pay higher taxes because it owned stock in out-of-state corporations disfavored by the law. *See Fulton Corp.*, 516 U.S. at 327–28.

The City does not address these cases in its briefing, but it distinguishes other cases on the basis that they addressed Article III rather than prudential standing. *See* MTD Reply (dkt. 28) at 5 (discussing, *e.g.*, *Bridenbaugh v. Freeman-Wilson*, 227 F.3d 848 (7th Cir. 2000)). The Supreme Court cases discussed above also do not explicitly address prudential standing. This Court is not, however, inclined to adopt a rule that would necessarily imply that a long line of Supreme Court precedent addressing the dormant Commerce Clause had no business before the Court, and could have been dismissed out of hand if the defendants had thought to raise a prudential standing argument. Instead, the fact that the Supreme Court reached the merits of those cases strongly implies that the plaintiffs had prudential standing. *See City of Los Angeles v. County of Kern*, 581 F.3d 841, 846 (9th Cir. 2009) (noting that courts must consider prudential standing before addressing constitutional questions "even when neither the trial court nor the parties have considered the nonconstitutional basis for decision" (citation omitted)); *see also Warth*, 422 U.S. at 517–18 (describing both Article III standing and prudential standing as "threshold determinants of the propriety of judicial intervention").

13

The cases that the City cites where "the other parties to the transaction" lacked prudential standing are not on point.  Not implicating the dormant Commerce Clause, they involve plaintiffs with injuries qualitatively different from the rights of other parties that had purportedly been violated.  In *Kowalski*, the plaintiffs were criminal defense attorneys who alleged that they suffered economic injury as a result of a law restricting appointment of counsel to indigent defendants in some circumstances.  *See Kowalski*, 543 U.S. at 127–28.  The Supreme Court appears to have held without discussion that the attorneys' economic injury was not sufficient to bring a *first-party* claim that the law unconstitutionally denied counsel to indigent defendants, and went to on to consider whether the attorneys satisfied the "'close relationship' and 'hindrance' criteria" for third-party standing.  *See id.* at 130.[7]  In *Wedges/Ledges of California, Inc. v. City of Phoenix*, the Ninth Circuit held that a manufacturer and distributor of crane games, despite the constitutionally cognizable injury of a reduced market for its products, could not assert the game operators' due process rights relating to licenses that had been denied or revoked by the defendant city.  *Wedges/Ledges*, 24 F.3d 56, 62 (9th Cir. 1994).  And in *Fleck & Associates, Inc. v. City of Phoenix*, the Ninth Circuit held that the corporate owner of a gay men's social club could not challenge a prohibition of "live sex act businesses" based on the privacy and liberty rights of the club's patrons to engage in sexual activity.  *Fleck*, 471 F.3d 1100, 1103–05 (9th Cir. 2006).

In each of these cases, the plaintiffs *themselves* did not have the right implicated by the challenged action.  The defense attorneys in *Kowalski* had no constitutionally protected right to be appointed, the game distributor in *Wedges/Ledges* had no due process right to its customers' licenses (although the court allowed it to proceed on substantive due process claims based on its own loss of business goodwill and right to pursue an occupation), and the corporation in *Fleck* had no protected privacy interest of its own.  *See Kowalski* 543 U.S. at 127–30; *Wedges/Ledges*, 24 F.3d at 62; *Fleck*, 471 F.3d at 1104–05.

A similar line could conceivably be drawn in the instant case if the right at issue were construed as the right *not to be discriminated against* in interstate commerce, but that is not how

[7] The Court ultimately held in *Kowalski* that these criteria were not satisfied.  *See Kowalski*, 543 U.S. at 132–34.

United States District Court
Northern District of California

United States District Court
Northern District of California

1   the Supreme Court has framed dormant Commerce Clause claims.  If it were, none of the plaintiffs

2   in *Tracy*, *Bacchus Imports*, *Fulton Corp.*, or *West Lynn Creamery* could have proceeded with their

3   claims because, as discussed above, they were not the parties allegedly discriminated against.

4   Instead, by permitting purchasers of disfavored out-of-state products to bring claims in each of

5   those cases, the Supreme Court held either implicitly or explicitly that—in at least some

6   circumstances—participants in interstate commerce have a cognizable right *to be free of*

7   *discriminatory restraints* even when they are not the target of discrimination.

8   **b.  HomeAway Is Not Directly Impacted by the Occupancy Requirement and Is Not a Party to Transactions Regulated by That Requirement**

9   Although a plaintiff need not be directly discriminated against to bring a dormant

10   Commerce Clause claim, HomeAway has cited no case extending this right to private entities

11   beyond the actual parties to transactions regulated by the challenged law.[8]  "It is common ground

12   that the judicial remedy cannot encompass every conceivable harm that can be traced to alleged

13   wrongdoing."  *Associated Gen. Contractors of Cal., Inc. v. Cal. State Council of Carpenters*, 459

14   U.S. 519, 536 (1983) (discussing proximate cause); *see also Wyoming v. Oklahoma*, 502 U.S. 437,

15   473 (1992) (Scalia, J., dissenting) (citing this principle in the context of prudential standing, an

16   issue not addressed in the majority opinion).  HomeAway itself appears to acknowledge that other

17   entities that provide services related to short-term rentals, such as "house cleaners, property

18   managers, . . . [and] maintenance people" would lack standing to challenge the Ordinance because

19   they are "only indirectly affected by the resident requirement," "[u]nless their business is largely

20

21

22   [8] The Court is aware of two Supreme Court cases in which a state or state agency had standing to challenge another state's law under the dormant Commerce Clause despite not being itself a party to regulated transactions.  *See Wyoming v. Oklahoma*, 502 U.S. 437 (1992); *Hunt v. Wash. State*

23   *Apple Advertising Comm'n*, 432 U.S. 333 (1977).  In *Wyoming*, the Court noted "serious and important concerns of federalism" implicated by the potential for Oklahoma's law to reduce

24   Wyoming's tax revenue, and thus found that hearing Wyoming's challenge comported with its constitutional grant of original jurisdiction over disputes between states.  *Wyoming*, 502 U.S. at

25   451.  In *Hunt*, the Court found that a potential loss in revenue to the Washington state commission that brought that claim was sufficient, *in conjunction with the commission's quasi-associational*

26   *standing to represent its constituent growers*, to support standing.  *See Hunt*, 432 U.S. at 345

27   (finding that "the Commission has standing to bring this action *in a representational capacity*" (emphasis added)).  The reasoning of these cases does not apply here.  HomeAway is not

28   analogous to either a state or a trade association, and the question of HomeAway's standing does not implicate federalism concerns.

15

1   confined to short-term residential rentals and they specifically cater to non-resident property

2   owners who offer their property in San Francisco for short-term rental."  Prelim. Inj. Reply at 2

3   n.2 (responding to examples from the City's Opposition).  Assuming for the sake of argument that

4   HomeAway falls within the exception it has set forth—this is doubtful; there are no allegations

5   that HomeAway specifically caters to non-resident property owners as opposed to resident

6   property owners, or to rentals in San Francisco as opposed to in locations unaffected by the

7   Ordinance—the difference in effect is one of severity, not of directness.

8        Just like, for example, a property manager, HomeAway's potential injury is a loss of

9   business providing an ancillary service to short-term rental transactions—transactions that

10   HomeAway is adamantly "not a party to."  *See* Compl. ¶ 30.  And just like the property manager,

11   HomeAway may lose business if the number of such transactions decreases (which is a plausible

12   effect of the Ordinance), although both HomeAway and the property manager would be free to

13   provide their services for short-term rentals permitted by the Ordinance.

14        HomeAway does not allege that it is "directly" affected by the occupancy requirement of

15   the Ordinance.  As noted, it is "not a party" to the transactions directly regulated.  *See id.*

16   HomeAway is therefore distinguishable from the plaintiffs in *Tracy*, *Bacchus Imports*, and *West*

17   *Lynn Creamery*, who purchased products subject to purportedly discriminatory taxes.  In this case,

18   the equivalent parties to those plaintiffs would be short-term tenants, not advertisers like

19   HomeAway.

20        Further, the Ordinance imposes no requirement that HomeAway facilitate or even abide by

21   the occupancy requirement.[9]  *Cf. Yakima Valley Memorial Hosp. v. Wash. State Dept. of Health*,

22   654 F.3d 919, 924, 932–33 (9th Cir. 2011) (holding that a plaintiff hospital had standing to

23   challenge a law requiring the hospital to obtain a permit to perform certain medical procedures).

24   With respect to Hosting Platforms like HomeAway, the Ordinance requires that they: (1) *inform*

25

26   ─────────────

27   [9] Because the Ordinance includes no mechanism for enforcing the occupancy requirement against hosting platforms, HomeAway cannot invoke the "forgiving" standard of third-party standing applied where "enforcement of the challenged restriction *against the litigant* would result indirectly in the violation of third parties' rights."  *See Kowalski*, 543 U.S. at 130 (quoting *Warth*, 422 U.S. at 510).

28

United States District Court
Northern District of California

United States District Court
Northern District of California

1    potential renters of the Ordinance's restrictions, a requirement that HomeAway does not challenge

2    or even discuss; and (2) collect taxes if they would already be required to do so under existing

3    provisions of the San Francisco Business and Tax Regulations Code.  *See* Ordinance at 21−22

4    (enacting S.F. Admin. Code § 41A.5(g)(4)).  As discussed further below in the context of

5    HomeAway's challenge to the tax collection requirement, the Court finds no reason to believe that

6    requirement applies to HomeAway at all, but even if it did, it would not bind HomeAway to

7    enforce the occupancy requirement for short-term rentals.

8            Allowing HomeAway—which is not a party to the regulated transactions—to challenge

9    the purported discrimination would constitute an unprecedented expansion of standing under the

10   dormant Commerce Clause.  Nor has HomeAway proposed an effective limiting rule that would

11   allow it to challenge the law—the "indirect effect" bar that HomeAway proposes to limit claims

12   by tangentially affected entities like house cleaners and property manages would also exclude

13   HomeAway itself.[10]  The Court accordingly holds, on prudential grounds, that HomeAway lacks

14   standing to assert that the Ordinance's purported discrimination against out-of-state property

15   owners violates any cognizable right of HomeAway itself.

16            **2.  HomeAway May Not Assert the Rights of Its Customers**

17           HomeAway also presents, in a footnote, the argument that it has standing to bring claims

18   on behalf of its customers because "HomeAway has a business relationship with property owners

19   who advertise on its websites, and it is uncertain whether non-San Francisco residents would act to

20   defend their rights because their individual stakes are small."  MTD Opp'n at 11 n.3.  HomeAway

21   did not pursue this theory at the hearing.

22

23   _____

24   [10] HomeAway argued for the first time at the hearing that other existing laws would prohibit it
     from offering advertising for rentals made illegal by the Ordinance.  Failing to raise a legal
     argument in briefing deprives the other party of an adequate opportunity to review that argument

25   and respond, and courts may disregard such arguments on that basis.  *See Pascual v. Wells Fargo
     Bank, N.A.*, No. CV 13-02005-KAW, 2013 WL 4066946, at *6−7 (N.D. Cal. Aug. 8, 2013).  Here,

26   even if the Court considers this untimely argument, it is inadequate because HomeAway failed to
     specifically identify any law preventing it from offering such advertising other than vague and

27   speculative reference to California's Unfair Competition Law.  Further, even if HomeAway is in
     fact barred from such advertising, it is still further removed from the purportedly discriminatory

28   rental restrictions than any plaintiffs in the dormant Commerce Clause cases it cites where
     standing was held to be adequate.

1    "A footnote is the wrong place for substantive arguments on the merits of a motion . . . ."

2  *First Advantage Background Servs. Corp. v. Private Eyes, Inc.*, 569 F. Supp. 2d 929, 935 (N.D.

3  Cal. 2008); *see also Foti v. McHugh*, 247 Fed. App'x 899, 901 n.2 (9th Cir. 2007) (finding that a

4  party waived an argument presented "[i]n a footnote to their counseled . . . brief citing no

5  authority"); *Hilao v. Estate of Marcos*, 103 F.3d 767, 778 (9th Cir. 1996) ("The summary mention

6  of an issue in a footnote, without reasoning in support of the appellant's argument, is insufficient

7  to raise the issue on appeal.").  Further, HomeAway's conclusory assertions regarding its

8  relationship with property owners and the size of their claims are not sufficient to support third-

9  party standing.

10    The Ninth Circuit has noted that "[e]xceptions to the prudential rule [against asserting the

11  rights of third-parties] are disfavored."  *Fleck*, 471 F.3d at 1105 n.3.  HomeAway cites no

12  authority that "a business relationship"—here, the provision of advertising services ancillary to

13  transactions regulated by the challenged Ordinance—is, on its own, sufficiently "close" to meet

14  the first prong of the third-party standing test.  *Cf. id.* (stating that the plaintiff business entity

15  "could not rely on the interests of its *customers*" for standing because it "alleged neither

16  condition" necessary for third-party standing (emphasis added)).  As for the second prong,

17  notwithstanding HomeAway's conclusory statement in its Opposition, there is no allegation in the

18  Complaint or evidence in the record that property owners face any "hindrance" to asserting their

19  own claims if they believe that the Ordinance's occupancy requirement is discriminatory.[11]  Even

20  if HomeAway sufficiently alleged that property owners lack a sufficient financial interest to justify

21  bringing a claim, HomeAway has cited no authority holding that a modest financial interest can

22  alone constitute a sufficient "hindrance" to justify third-party standing.  Decisions that have found

23  a sufficient hindrance generally identify more structural concerns than are present here.  *See, e.g.*,

24

_____

25  [11] One underlying principle of the prohibition of third-party standing is that the prerogative lies
with the directly interested party to decide whether to bring an action.  *See Singleton v. Wulff*, 428
26  U.S. 106, 113−14 (1976) ("[T]he courts should not adjudicate such rights unnecessarily, and it
may be that in fact the holders of those rights . . . do not wish to assert them . . . .").  The Court
27  therefore cannot conclude that property owners (or short-term tenants) face a "hindrance" based
solely on the fact that they have not brought a claim.  As Supreme Court acknowledged in
28  *Singleton*, it may be that they simply "do not wish to assert" the rights that the Ordinance
purportedly implicates.

United States District Court
Northern District of California

1   *Powers*, 499 U.S. at 414−15 (finding that in addition to a "small financial stake," potential jurors

2   face barriers to asserting their own interests in not facing discriminatory challenges because "they

3   are not parties to the jury selection process[,] have no opportunity to be heard at the time of their

4   exclusion," and probably would be unable to show likelihood of recurrence); *Singleton v. Wulff*,

5   428 U.S. 106, 117 (1976) (finding that women seeking abortions were hindered in asserting their

6   own claims based on the chilling effect of privacy concerns and the "imminent mootness" of any

7   individual pregnant woman's claim).

8          Because HomeAway has shown neither a close relationship with property owners nor that

9   such owners face any cognizable hindrance in asserting their own rights, HomeAway cannot rely

10  on the third-party standing doctrine to assert the rights of property owners.

### 3.  HomeAway Lacks Prudential Standing to Challenge the Occupancy Requirement

12          Third-party standing is disfavored for two primary reasons: to avoid unnecessary litigation

13  where the holder of rights may not actually assert them, and to ensure effective advocacy on the

14  basis that "third parties themselves usually will be the best proponents of their own rights."

15  *Singleton*, 428 U.S. at 113−14.  Those considerations weigh particularly heavily in this case,

16  which presents a difficult constitutional question regarding the validity of a local ordinance.

17          The parties fundamentally disagree as to whether the occupancy requirement is

18  discriminatory.  In one sense, only San Francisco residents may offer *any* residential property for

19  short-term rental.  In another sense, the restrictions apply equally to locals and non-locals: San

20  Francisco residents, just like non-residents, may not rent out properties that they do not reside in

21  for at least 275 days of the year, and the Ordinance does not purport to bar non-residents, any

22  more than residents, from renting out the homes in which they primarily reside.  Neither party has

23  cited a dormant Commerce Clause case raising an analogous question.

24          If out-of-state owners of San Francisco property (or the short-term tenants seeking to rent

25  from such owners) view themselves as victims of discrimination, the Court would benefit from

26  their perspective and advocacy.  If they do not, it is for them to decide whether they wish to bring

27  a claim.  *See Singleton*, 428 U.S. 106, 117.  The Court therefore holds that HomeAway lacks

28

1    prudential standing to challenge the Ordinance's occupancy requirement, and GRANTS the City's

2    motion to dismiss that challenge.[12]

3    **V.      ANALYSIS OF TAX COLLECTION CHALLENGE**

4          The second component of HomeAway's claims challenges the Ordinance's mandate that

5    "[a] Hosting Platform shall comply with the requirements of the [San Francisco] Business and Tax

6    Regulations Code by, among other applicable requirements, collecting and remitting all required

7    Transient Occupancy Taxes."  Ordinance at 22 (enacting S.F. Admin. Code § 41A.5(g)(4)(b)); *see*

8    Compl. ¶¶ 57−66.

9          HomeAway states that it initially "challenged [this provision] because it read the pertinent

10   provisions as imposing on Hosting Platforms the responsibility for ensuring that the Transient

11   Occupancy Tax ('TOT') is collected in short-term rental transactions, even if the Tax Collection

12   Regulations would not require a Hosting Platform to be responsible for collecting the TOT."

13   Prelim. Inj. Reply at 7.  The City, however, states that the Ordinance "does not impose a new tax

14   collection obligation on Hosting Platforms or expand any existing one" beyond what is

15   independently required by the San Francisco Business and Tax Regulations Code.  MTD at 7.

16   HomeAway does not dispute this interpretation, *see* Prelim. Inj. Reply at 7−8, and its counsel

17   confirmed at the hearing that "there's an agreement between us and the City . . . that the hosting

18   platform requirements that relate to tax in the new Ordinance don't extend tax obligations."

19   HomeAway's attorney went on to state that "as long as that's the case . . . then we don't have a

20   dispute over the hosting platform obligations and that takes care of that issue."  The Court agrees

21   that based on the parties' stipulation as to the meaning of the Ordinance, HomeAway's challenge

22   to the tax collection provision fails for lack of standing.

23       **A.      Article III Standing for Prospective Relief**

24        In order to establish standing to seek an injunction, a plaintiff must face an injury that is

25   "actual or imminent, not conjectural or hypothetical."  *Lujan v. Defenders of Wildlife*, 504 U.S.

26   555, 560 (1992) (citations and internal quotation marks omitted).  In other words, "he or she must

27   ───────────────

28   [12] HomeAway did not suggest in its briefs or at the hearing that it could allege additional facts that would alter the Court's conclusion that HomeAway lacks prudential standing.  HomeAway's challenge to the occupancy requirement is therefore dismissed without leave to amend.

United States District Court
Northern District of California

1    demonstrate a 'very significant possibility of future harm.'" *In re Static Random Access Memory*

2    *(SRAM) Antitrust Litig.*, 264 F.R.D. 603, 610 (N.D. Cal. 2009) (quoting *San Diego Cnty. Gun*

3    *Rights Comm. v. Reno*, 98 F.3d 1121, 1126 (9th Cir. 1996)).  Further, there "there must be a causal

4    connection between the injury and the conduct complained of," and "it must be likely, as opposed

5    to merely speculative, that the injury will be redressed by a favorable decision." *Lujan*, 504 U.S.

6    at 560–61 (citations and internal quotation marks omitted).

       **B.**    **HomeAway's Complaint Challenges the Wrong Ordinance**

7         HomeAway acknowledges that the Court need not reach its challenge to the TOT

8    requirements if "HomeAway has no TOT collection obligation," but asserts in its Opposition that

9    "[i]f Defendants believe that HomeAway must collect the TOT, then there is a constitutional

10   fight."  MTD Opp'n at 17.  So long as any such obligations stem from existing municipal code

11   provisions that predate the Ordinance, however, HomeAway's present Complaint does not

12   properly raise such a "fight," because it fails the causation and redressability elements of Article

13   III standing.

14        With respect to causation, the only conduct that HomeAway complains of is the enactment

15   of the Ordinance.  The parties now agree that the Ordinance imposes no new tax collection

16   obligations.  HomeAway has therefore failed to establish any "causal connection between the

17   injury and the conduct complained of."  *See Lujan*, 504 U.S. at 560.

18        As for redressability, HomeAway seeks a declaration that the Ordinance is unconstitutional

19   and an injunction barring its enforcement.  *See* Compl. ¶¶ (1)–(2) (Prayer for Relief).  Neither a

20   declaration nor an injunction *as to the Ordinance* would alter the effect of *preexisting* municipal

21   code provisions, which the parties now agree are the only possible source of any obligation of

22   hosting platforms like HomeAway to collect the TOT.  HomeAway has therefore failed to

23   establish that it is "likely . . . that the injury will be redressed by a favorable decision." *See Lujan*,

24   504 U.S. at 561.

25        Because HomeAway's challenge to the Ordinance's tax collection provision does not meet

26   the causation and redressability prongs of the *Luhan* standard, the Court GRANTS the City's

27   motion to dismiss that portion of HomeAway's Complaint for lack of Article III standing.

28

United States District Court
Northern District of California

**C.   HomeAway Lacks Article III Standing to Challenge the TOT Collection Requirement**

In considering whether leave to amend is appropriate, the Court also considers whether HomeAway has Article III standing the challenge the TOT collection requirement imposed by *existing* provisions of the Business and Tax Regulations Code.

The City assesses a tax "on the rent for every occupancy of the guest rooms in [a] hotel," commonly known as the "transient occupancy tax" or "TOT." *See* S.F. Bus. & Tax Regs. Code §§ 502.6; 502.6-1; 502.6-2.  The operator of a hotel is required to collect this tax from occupants along with rent, and to remit the tax to the City.  For the purpose of assessing the TOT, the municipal code defines an "operator" as "[a]ny person operating a hotel in the City and County of San Francisco, including, but not limited to, the owner or proprietor of such premises, lessee, sublessee, mortgagee in possession, licensee or any other person otherwise operating such hotel." S.F. Bus. & Tax Regs. Code § 501(a).[13]  Under authority provided by the municipal code,[14] the Tax Collector has promulgated regulations clarifying the application of the TOT to private residences that are rented on a short-term basis, particularly where such transactions involve internet-based services:

> (i)  A "guest room" within the meaning of the TOT includes a private residence . . . or any portion thereof . . . .  Occupancy of such guest room is subject to the TOT.

> (ii)  The full amount that an occupant pays to secure or obtain the right to occupy a guest room is "rent" subject to the TOT, regardless of whether any portion of that payment is characterized as a "service fee" or otherwise.  The full amount received by a website company, or any other person acting as merchant of record in connection with an occupancy transaction, is "rent" subject to the TOT.

> (iii)  A website company, or any other person acting as merchant of record who receives rent in connection with an occupancy transaction, is an "operator" who is responsible for collecting the TOT owed by the occupant and for remitting the TOT to the

---

[13] A "hotel" is defined as "[a]ny structure, or any portion of a structure, including any lodginghouse, roominghouse, dormitory, Turkish bath, bachelor hotel, studio hotel, motel, auto court, inn, public club, or private club, containing guest rooms and which is occupied, or is intended or designated for occupation, by guests, whether rent is paid in money, goods, labor, or otherwise. It does not include any jail, hospital, asylum, sanitarium, orphanage, prison, detention, or other building in which human beings are housed and detained under legal restraint."  S.F. Bus. & Tax Regs. Code § 501(d).
[14] S.F. Bus. & Tax Regs. Code §§ 6.16-1; 504.

United States District Court
Northern District of California

City. . . .

S.F. Tax Collector Reg. 2012-1 (available in the record as Goldman MTD Decl. Ex. C (dkt. 17-3)).

HomeAway's Complaint, which the Court takes as true for the purpose of a motion to dismiss, alleges that "Home Away does not receive any rental fees from Travelers," nor does it "collect rental fees from Travelers for remittance to Listing Owners."  Compl. ¶ 30.  Instead, property owners usually pay a subscription fee to list their properties on HomeAway's various websites.  *Id.* ¶ 29.  In "far less common" circumstances, "the Listing Owner agrees to pay up to 10% of the value of a confirmed booking for the listing."  *Id.*  "Under either approach, however, Listing Owners correspond directly with travelers to arrange and contract for rentals and collect all rental fees (although some Listing Owners use third party payment services to collect fees)."  *Id.*

Taking these allegations as true, HomeAway is not an "operator" subject to any obligation to collect the TOT.  It does not receive "rent" from tenants, and does not "act[] as merchant of record" in rental transactions.  *See* S.F. Tax Collector Reg. 2012-1.  HomeAway therefore faces no apparent injury as a result of the TOT collection requirement, and lacks standing to challenge it.  Accordingly, HomeAway may not amend its Complaint to bring a dormant Commerce Clause challenge to the existing Business and Tax Regulations Code provisions unless HomeAway is also able to allege independent facts supporting a plausible conclusion that it faces actual or imminent injury as a result of those provisions.

## VI.   MOTION FOR PRELIMINARY INJUNCTION

### A.   Legal Standard

"A preliminary injunction is an extraordinary remedy never awarded as of right."  *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 24 (2008).  "A plaintiff seeking a preliminary injunction must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest."  *Id.* at 20.  Irreparable harm must be likely—it is no longer sufficient to grant a preliminary injunction upon a mere showing of a "possibility" of irreparable harm when the other factors weigh heavily in favor of the plaintiff.  *Alliance for the*

1    *Wild Rockies v. Cottrell*, 632 F.3d 1127, 1132 (9th Cir. 2011).  Nonetheless, the Ninth Circuit still

2    evaluates the likelihood of success on a "sliding scale."  *Id.*  A preliminary injunction may be

3    warranted upon a showing of "*serious questions* going to the merits" as well as "a hardship

4    balance that tips *sharply* toward the plaintiff," so long as the plaintiff is likely to suffer irreparable

5    harm and the injunction is in the public interest.  *Id*. (emphasis added).

6    **B.    HomeAway Is Not Entitled to a Preliminary Injunction**

7    Because HomeAway lacks Article III standing to challenge the TOT collection

8    requirement, the Court lacks jurisdiction to further consider HomeAway's claims based on that

9    provision of the Ordinance.  As for HomeAway's challenge to the Ordinance's occupancy

10   requirement, HomeAway's request for a preliminary injunction must be DENIED.  The Court

11   cannot conclude that HomeAway is likely to succeed on, or even that "serious questions go[] to

12   the merits" of, claims that HomeAway lacks prudential standing to bring.  *See id.*

13   **VII.   CONCLUSION**

14   For the reasons stated above, the Court GRANTS the City's motion to dismiss

15   HomeAway's Complaint, and DENIES HomeAway's motion for a preliminary injunction.

16   HomeAway's Complaint is therefore DISMISSED, with leave to amend only as to HomeAway's

17   challenge to the TOT collection requirement, and then only if HomeAway can allege facts

18   supporting a plausible conclusion that it faces actual or imminent harm.  If HomeAway wishes to

19   file an amended complaint, it must do so no later than February 26, 2014.

20   **IT IS SO ORDERED.**

21   Dated: January 27, 2015

22   _____

23   JOSEPH C. SPERO
     Chief Magistrate Judge

24

25

26

27

28

United States District Court
Northern District of California

24